FILED
UNITED STATES DISTRICT COURT
DENVER, ~~~~~~

OCT 24 2006

GREGORY C. LANGHAM
CLERK

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

Civil Action #: **06 - CV - 02124**-msk-meh

Evan Spencer,

Plaintiff,

versus,

The Colorado Supreme Court, Chief Justice Mary J. Mullarkey, Justice Michael L. Bender, Justice Gregory J. Hobbs, Jr., Justice Nancy E. Rice, Justice Alex J. Martinez, Justice Nathan B. Coats, and Justice Allison Eid, personally, and in their representative capacities as Justices of the Colorado Supreme Court, AND, the Colorado State Board of Law Examiners, Executive Director Alan K. Ogden, Susan Q. Gleeson, Susan B. Hargleroad, Shari Frausto, Les Woodward, Carlos Samour, James Coyle, III, Linda Donnelly, and Melanie Backes, personally, and in their representative capacities as agents of the Colorado Board of Law Examiners.

Defendants.

## COMPLAINT

## <u>INTRODUCTION</u>

1) This is an action for compensatory and punitive damages commenced by Plaintiff

in response to Defendants' violations of 42 U.S.C. Section 12101 (the Americans

with Disabilities Act "ADA"), 42 U.S.C Section 1983 (the Civil Rights Act

"CRA"), and the United States Constitution (the "Constitution").

2) Plaintiff asserts that Questions #39 and #40 of Defendants' 2002 bar application

(attached hereto as Exhibit "A"), Defendants' 2004 demand for Plaintiff's 1999

hospital record (attached hereto as Exhibit "B"), Defendants' 2002 Authorization

and Release form (attached hereto as Exhibit "C"), Defendants' inquiry panel

hearing of Plaintiff October 20, 2004, Defendants' refusal to provide a medical

evaluation for Plaintiff, Defendants' 18-month admission deadline, and

Defendants' ultimate denial of Plaintiff's application for admission to practice law in the State of Colorado (attached hereto as Exhibit "D"), individually and collectively violate the ADA, CRA, and multiple provisions of the Constitution, including the Due Process Clause of the 14th Amendment, the Interstate Privileges and Immunities Clause, the Equal Protection Clause, and the Constitutional right of Privacy.

## JURISDICTION AND VENUE

3) This action arises under the law of the United States, including the Constitution, the ADA, the CRA and Section 505 of the Rehabilitation Act of 1973.

4) This Court has jurisdiction to grant the requested relief pursuant to 28 U.S.C. Sections 1331 and 1343.

5) Venue is proper in the Court pursuant to 28 U.S.C. Section 1391(b).

## PARTIES

6) Plaintiff is an attorney admitted to practiced law in 1997 in New York in good standing (Plaintiff's Affidavit of Good Standing dated 9/27/06 attached hereto as Exhibit "E"), who applied for admission to the Colorado bar in May 2002, passed the Colorado bar exam and fulfilled all necessary requirements for admission as of May 2004, and was ultimately denied admission in December 2005 for failing to provide a 1999 hospital record under suspicion it relates to mental health.

7) Plaintiff has recovered millions of dollars for hundreds of clients and is intimately familiar with all facets of civil litigation from complaint to appeal, having practiced in courts including but not limited to the New York State Supreme

2

Courts of New York County, Kings County, Queens County, Richmond County, Westchester County, the New York Civil Courts of New York County, Kings County, and Queens County, and Federal District Court in California.

8)  During Plaintiff's 10 years of admission, the New York State licensing authority never received a single complaint with regard to Plaintiff's practice of law.

9)  Plaintiff is a "qualified individual with a disability" within the meaning of the ADA and a Colorado resident and United States citizen entitled to all protections the Constitution and laws of the United States.

10) Defendant Colorado Supreme Court (the "Court"), located at 2 E. 14th Ave., Denver, CO  80203, is the state judicial body which exercises jurisdiction over the licensing of persons to practice law in Colorado.  Colorado Rules of Civil Procedure (C.R.C.P.) 201.1

11) Defendants Mary J. Mullarkey, Michael L. Bender, Gregory J. Hobbs, Jr., Nancy E. Rice, Alex J. Martinez, Nathan B. Coats, and Allison Eid, are Justices of the Court.

12) The Court has delegated to Defendant the Colorado Board of Law Examiners (the "Board"), located at 1560 Broadway, Suite 1820, Denver, CO  80202, the function of determining if candidates are "mentally stable and morally and ethically qualified for admission." C.R.C.P. 201.6 (1)

13) Defendants Alan K. Ogden, Susan Q Gleeson, Susan B. Hargleroad, Shari Frausto, Les Woodward, Carlos Samour, James Coyle, III, Linda Donnelly, and Melanie Backes are agents of the Board.

14) Defendants are "public entities" within the meaning of the ADA, which defines "public entity" as, "any department, agency, special purpose district or other instrumentality of a State or States or local government." ADA Section 201(1)(B)

15) Defendants are jointly and severally liable to Plaintiff for damages hereinafter enumerated in this Complaint.

## FACTUAL BACKGROUND

16) On September 11, 2001, Plaintiff was living and practicing law in the same building in New York City (1 West Street/17 Battery Place), a few blocks south of the World Trade Center.

17) After witnessing the events of September 11th and the aftermath that followed in New York City, Plaintiff applied for admission to the Colorado bar, submitting an application in May 2002 and moving to Colorado September 2004 where Plaintiff has since resided.

18) Question #39 of the 2002 Colorado bar application ("Question #39") asks:

> Within the past five years have you been diagnosed with or been treated for any of the following: schizophrenia or any other psychotic disorder, delusional disorder, bipolar or manic depressive mood disorder, major depression, antisocial personality disorder, or another condition which significantly impaired your behavior, judgment, understanding, capacity to recognize reality, or ability to function in school work or other important life activities?

19) Answering "YES" to Question #39 provokes a more invasive inquiry by Defendant, the Board.

20) Question #40 of the 2002 Colorado bar application ("Question #40") asks:

"Within the past five years, have you at any time been admitted as a patient to a

4

hospital, either on a voluntary or involuntary basis, for treatment of any emotional or mental disability or disorder?"

21) Answering "YES" to Question #40 provokes a more invasive inquiry by Defendant, the Board.

22) Defendants "Authorization and Release" form (attached hereto as Exhibit "C") entitles Defendants to obtain every "document," "record," "information," "or any other pertinent data," including those that are "informal" or "erased by law" held by any "person," "company," "corporation," "association," "court," or governmental entity," relating to Plaintiff.

23) Despite Plaintiff's attempts to conceal Plaintiff's disability during the application process, in 2004, the Board discovered and demanded a copy of Plaintiff's 1999 hospital record under suspicion it related to mental health (Defendant's demand attached hereto as Exhibit "B").

24) After Plaintiff obtained and reviewed a copy of this record, Plaintiff determined that it contained highly personal matters that Plaintiff did not wish to disclose.

25) While Plaintiff informed the Board that this record pertained to a disability protected by the ADA (letter attached hereto as Exhibit "F"), the Board persisted in its request and ultimately denied Plaintiff's application by letter dated December 8, 2005 (attached hereto as Exhibit "D") for failing to provide this record.

26) Failure to provide what is now a 7-year old medical record was the sole reason given by the Board for Plaintiff's denial of admission; Plaintiff has fulfilled all other requirements for admission to the Colorado bar.

27) Following the denial of Plaintiff's application, Plaintiff submitted an 18-page complaint (attached hereto as Exhibit "G") to the Department of Justice ("DOJ"), Division of Civil Rights.

28) After six (6) months, the DOJ responded with a form letter (attached hereto as Exhibit "H"), stating that, "due to the hundreds of title II complaints that we receive each year, we do not have the resources to resolve all of them.  We have made no determination regarding the merits of your complaint… our decision does not affect your right to pursue your complaint in another matter."

29) While Plaintiff fulfilled all requirements for admission to the Colorado bar 2 ½ years ago and was to be admitted to practice law in Colorado May 24, 2004 (letter attached hereto as Exhibit "I"), Defendants have denied Plaintiff's application, eliminating Plaintiff's ability to practice his profession.

30) As a result of Defendant's discriminatory and unconstitutional conduct, Plaintiff has no income or medical insurance, and must depend on the generosity of friends and family to live while awaiting the resolution of this action.

31) Plaintiff is unable to return to New York to practice law because of the haunting associations of September 11th.

32) Plaintiff is unable to apply for admission in other jurisdictions while this dispute is pending as all states ask whether an application for admission has been denied in another jurisdiction.

33) The ADA protects qualified individuals with physical and mental disabilities from discrimination.

34) Under the ADA:

> Examples of physical or mental impairments include, but are not limited to, such contagious and non-contagious diseases and conditions as orthopedic, visual, speech, and hearing impairments; cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease… tuberculosis, drug addiction, and alcoholism.

35) The aforementioned list of disabilities is not exclusive, and would therefore include bipolar disorder, schizophrenia, autism spectrum disorders, terets syndrome, lupus, and a host of additional physical and mental disabilities.

36) There is no medical or legal basis for Defendants to conclude that bipolar disorder affects one's ability to practice law more than cancer, AIDS, epilepsy, autism spectrum disorders, deafness, blindness, or dozens of other serious illnesses and disorders that are exempt from scrutiny, yet the Defendants application process subjects bipolar applicants such as Plaintiff to prejudice and discrimination while exempting other applicants with more severe physical and mental disabilities.

37) In Supreme Court of New Hampshire v. Piper, 470 U.S. 274 (1985), the United States Supreme Court established the precedent that, "the opportunity to practice law should be considered a 'fundamental right.'"

38) In Schware v. Board of Bar Examiners, 353 U.S. 232 (1957), the Supreme Court established several precedents regarding the admission of bar applicants that have been violated by the Defendants.

39) The Court in Schware ruled that, "a person cannot be prevented from practicing (law) except for valid reasons. Certainly the practice of law is not a matter of the State's grace," that "(O)fficers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their

action is invidiously discriminatory," and that "…any qualification must have a rational connection with the applicant's fitness or capacity to practice law."

40) Plaintiff's 1999 hospital record does not have a "rational connection" to Plaintiff's "fitness or capacity to practice law," the Defendants have denied Plaintiff's application without "valid reasons," and Defendants' conduct is "invidiously discriminatory," all in violation of Supreme Court precedent.

41) The ADA regulations promulgated by the United States Department of Justice implementing the prohibition of discrimination by a public entity read as follows: "a public entity may not… utilize criteria… [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."

42) Section 35.130(b)(6) of the ADA states that:

> A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability, nor may a public entity establish requirements for the programs or activities of licensees or certified entities that subject qualified individuals with disabilities to discrimination on the basis of disability.

43) Section 35.130(b)(8) of the ADA: "…forbids a public entity from… imposing or applying eligibility criteria that screen out or tend to screen out any individuals with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity…"

44) Since 1990, courts have consistently held that inquiries similar to the Board's violate the ADA:

> (see Ellen S. v. Florida Board of Bar Examiners, 859 F. Supp at 1493 (S.D.Fla. 1994) Florida's mental health questions "discriminate against Plaintiffs by subjecting them to additional burdens based on their disability"; Medical Society of New Jersey v. Jacobs, 1993 WL 413016, *7 (D.N.J. 1993) mental health questions imposed extra burdens on

qualified persons with disabilities in violation of ADA; In re applications of Underwood and Plano No. BAR-93-21, 1993 WL 649283 at *2 (Me. Dec. 7, 1993) requirement that applicants answer mental health questions discriminates on the bases of disability and imposes eligibility criteria that unnecessarily screen out individuals with disabilities; In re Petition for Admission to the R.I. Bar, 683 A.2d 1333 (1996), the Court ordered a rewriting of two bar application questions such that one question would now ask only whether the applicant was *currently* suffering from any disorder that impairs judgment or would adversely affect the ability to practice law; Clark v. Virginia Board of Bar Examiners, 880 F.Supp. at 431 (E.D.Va. 1995) "unlike other applicants, those with mental disabilities are required to subject themselves to further inquiry and scrutiny. The Court finds that this additional burden discriminates against those with mental disabilities." Id at 442); and In re Petition of Frickey, et al., 515 N.W.2d 741 (Minn. 1994) where questions regarding mental health history from bar admissions application were deleted on grounds that they deterred law students from seeking needed counseling.)

45) Defendants also subjected Plaintiff to an overzealous inquiry panel hearing in 2004 where numerous questions violated the ADA and Constitution.

46) Defendants ultimately denied Plaintiffs application for failing to produce what is now a 7-year old hospital record, based upon an 18-month admission deadline (from date of passing bar).

47) Wherefore, as Plaintiff attempted to resolve this matter unsuccessfully from 2002 to 2005 with Defendants, and as the DOJ has failed to take action with regard to this matter, Plaintiff prepared, filed, and served this complaint.

48) Plaintiff respectfully requests that this Court grant the relief hereinafter requested.

## FIRST CAUSE OF ACTION
## ADA VIOLATIONS

49) Defendant's application process and denial of Plaintiff's application for admission to practice law in Colorado violate the ADA.

50) The ADA (codified as U.S.C. Title 42, Chapter 126, Section 12101) states:

> Congress finds that: **(1)** some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older; **(2)** historically, society has tended to isolate and segregate individuals with disabilities... such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; **(3)** discrimination against individuals with disabilities persists in such critical areas as employment... public accommodations... and access to public services; **(4)** unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; **(5)** individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion... overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; **(6)** census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally; **(7)** individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment... based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society; **(8)** the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and **(9)** the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

51) Title II of the ADA prohibits "discrimination" by a "public entity" against a "qualified individual" with a "disability."

52) The ADA defines "qualified individual" as "an individual with a disability who, with or without reasonable modification to rules, policies, or practices... meets

the essential eligibility requirements for the receipt of services or the participation

in programs or activities provided by the public entity." 42 U.S.C. Sect. 12131(2).

53) Plaintiff is a "qualified individual" in that Plaintiff is a New York attorney who

passed the Colorado bar exam and has fulfilled all requirements for admission to

the Colorado bar.

54) Section 35.130(b)(6) of the ADA defines "discrimination" in the context of a bar

application process as the administration of a, "licensing program in a manner that

subjects qualified individuals with disabilities to discrimination on the basis of

disability," and establishes, "requirements... that subject qualified individuals

with disabilities to discrimination on the basis of disability."

55) Section 35.130(b)(8) of the ADA: "...forbids a public entity from... imposing or

applying eligibility criteria that screen out or tend to screen out any individuals

with a disability or any class of individuals with disabilities from fully and

equally enjoying any service, program, or activity..."

56) The ADA defines "disability" as "a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; a

record of an impairment; or being regarded as having such an impairment."

42 U.S.C Section 12102(2).

57) Plaintiff has a mental disability, bipolar disorder, with a record of diagnosis,

treatment, and impairment, and is "regarded as" having bipolar disorder.

58) A "public entity" is defined by the ADA as "any State or local government" or

"any department, agency ... or other instrumentality of a State or States or local

government."

59) Defendants are "public entities" in that the Court and its Justices and the Board

and its members are "instrumentalities" of the *Colorado* "State government."

60) Title II of the ADA prohibits a licensing board from imposing unnecessary

burdens on persons with disabilities at all stages of the licensing process,

regardless of whether a license is granted. (*see* Ellen S. v. Florida Board of Bar

Examiners, 859 F. Supp at 1493 (S.D.Fla. 1994) "(F)or Defendants to have

discriminated against Plaintiffs in contravention of the ADA, Defendants neither

need to deny Plaintiff's admission to the Florida Bar nor possess actual

knowledge of Plaintiffs' disabilities.")

61) As hereinafter described in this, the First Cause of Action, the Board's repeated

requests in 2004 and 2005 for Plaintiff's 1999 hospital record, Questions #39 and

#40 of Defendants' 2002 bar application, Defendants' Authorization and Release

form, the Board's  2004 inquiry panel hearing, Defendants' 18-month admission

deadline, the Board's denial of Plaintiff's request for a medical evaluation, and

Defendants' ultimate denial of Plaintiff's application violate Section 35.130(b)(6)

and (8) of the ADA by subjecting, "qualified individuals with disabilities to

discrimination on the basis of disability," and "… imposing or applying eligibility

criteria that screen out or tend to screen out any individuals with a disability or

any class of individuals with disabilities…"

62) Applicants without disabilities are not required to disclose medical history to

Defendants.

63) Therefore, Defendants' repeated demands for Plaintiff's 1999 hospital record posed a requirement based upon Plaintiff's disability that is far greater than requirements imposed on other applicants, violating the ADA.

64) Question #39 asks: "Within the past five years have you been diagnosed with or been treated for any of the following: schizophrenia or any other psychotic disorder, delusional disorder, bipolar or manic depressive mood disorder…"

65) Answering "YES" to Question #39 provokes a more invasive inquiry.

66) Question #39 violates the ADA by creating requirements and eligibility criteria that tend to screen out certain applicants with certain mental disabilities, including Plaintiff's disability, bipolar disorder.

67) Question #39 is based upon prejudices and stereotypes which imply that bipolar disorder affects an applicant's ability to practice law more significantly than applicants with other mental and physical disabilities.

68) Physical disabilities such as blindness, deafness, paralysis, cancer, and AIDS, affect an individual's ability at least as much as bipolar disorder, yet applicants with these disabilities are immune from Defendants' inquiries.

69) Question #39 is also discriminatory because it isolates applicants who have received treatment for further inquiry while those who have not received treatment are exempt.

70) As a disabled individual who has sought treatment, Plaintiff is at a disadvantage to disabled individuals who do not seek treatment.

71) This policy discourages law students and other applicants, including Plaintiff, from seeking treatment for fear that it will be discovered by Defendants.

13

72) There are many successful and famous people with bipolar disorder who have risen to the top of their profession in spite of this mental disability.

73) Media mogul and billionaire Ted Turner, journalist Jane Pauley, rocks stars Sting and Ray Davies, actor/comedian Ben Stiller, martial artist/actor Jean-Claude Van Damme, actresses Carrie Fisher, Vivien Leigh, Patty Duke, Linda Hamilton, and Margot Kidder, and novelist Virginia Woolf all have bipolar disorder.

74) Since the diagnosis of bipolar disorder (manic depression) is relatively recent, individuals prior to the 20th century with the bipolar disorder can not be confirmed, but it is widely believed that individuals such as Beethoven, Napoleon, Florence Nightingale, Vincent Van Gogh, and Sir Isaac Newton were all bipolar (*see* Wikipedia.org).

75) As so many individuals have been able to succeed in their professions in spite of bipolar disorder, it is false for Defendants to conclude that bipolar disorder affects an applicant's ability to practice law more than other disabilities.

76) Question #39 is also vague and overly-inclusive.

77) A five-year history of treatment is unnecessary; the Defendants' "compelling interest" is to determine the applicant's "current" ability to practice law and medical history is irrelevant to this inquiry.

78) In addition, the last portion of Question #39 includes the following catch-all description: "… another condition which significantly impaired your behavior, judgment, understanding, capacity to recognize reality, or ability to function in school work or other important life activities?"

79) How does an applicant determine if a condition is "significant"?  What is an "important life activity"?

80) For a variety of reasons, Question #39 is discriminatory, prejudicial, vague, and over-inclusive, in violation of the ADA.

81) Question #40 asks: "Within the past five years, have you at any time been admitted as a patient to a hospital, either on a voluntary or involuntary basis, for treatment of any emotional or mental disability or disorder?"

82) Answering "YES" to Question #40 provokes a more invasive inquiry.

83) Question #40 violates the ADA by isolating certain mental disabilities for persecution, while exempting physical disabilities, precisely the kind of discrimination the ADA was designed to eliminate.

84) In Clark v. Virginia Board of Bar Examiners, 880 F.Supp. at 431 (E.D.Va. 1995) the District Court ruled that the following question (virtually identical to Question #40), violated the ADA: "Have you within the past five (5) years been treated or counseled for any mental, emotional or nervous disorder?"

85) Question #40 arbitrarily inquires into certain mental disabilities while exempting physical disabilities.

86) Defendants' inquiry into mental disabilities is based upon stereotypes and prejudices against those with mental illness, suggesting that applicants with mental disabilities are less fit to practice law than those with physical disabilities.

87) There is no medical or legal basis for concluding that *mental* disabilities (ie. bipolar disorder, schizophrenia) affect one's ability to practice law more than *physical* disabilities (ie. blindness, cancer).

88) Defendants application process also violates the ADA by requiring Plaintiff to execute a broad "Authorization and Release" form (attached hereto as Exhibit "C") as follows:

> I hereby authorize and request every person, firm, company, corporation, governmental agency, court, association or institution having control of any documents, records and other information, including documents, records, bar association files regarding charges or complaints filed against me, including all complaints erased by law, formal or informal, pending or closed, or any other pertinent data, to permit the Colorado Board of Law Examiners or any of its agents or representatives to inspect and make copies of such documents, records and other information."

89) The aforementioned Authorization and Release form violates the ADA because it subjects Plaintiff to discrimination on the basis of his disability, providing Defendants a means of uncovering all "documents" and "records" from every "person," "company," "association," or "institution," having information pertaining to Plaintiff's disability.

90) Plaintiff's position regarding Question #39 and #40, Plaintiff's 1999 hospital record, and the Defendants' Authorization and Release form have been soundly supported by virtually all courts applying the ADA to state licensing procedures.

91) In Maine, the court ruled that bar examiner's inquiry into diagnosis and treatment for emotional, nervous or mental disorders, and accompanying medical authorization form, violates ADA In re Applications of Underwood and Plano, No. BAR-93-21, 1993 WL 649283 at *2 (Me. Dec. 7, 1993).

92) In Clark v. Virginia Board of Bar Examiners, 880 F.Supp. at 431 (E.D.Va. 1995) the court stated that according to the American Psychiatric Association, "psychiatric history should not be the subject of applicant inquiry because it is not an accurate predictor of fitness." Id, at 435.

93) The Virginia District Court concluded in <u>Clark</u> that Question 20(b): "Have you within the past five (5) years been treated or counseled for any mental, emotional or nervous disorder?" violated the ADA because, "unlike other applicants, those with mental disabilities are required to subject themselves to further inquiry and scrutiny.  The Court finds that this additional burden discriminates against those with mental disabilities." <u>Clark</u> at 442.

94) In <u>Ellen S. v. Florida Board of Bar Examiners</u>, 859 F. Supp at 1493 (S.D.Fla. 1994), the court ruled that Florida's mental health questions "discriminate against Plaintiffs by subjecting them to additional burdens based on their disability."

95) In <u>Medical Society of New Jersey</u>, at 7 (D.N.J. 1993) the court ruled that mental health questions imposed extra burdens on qualified persons with disabilities in violation of ADA ("extra investigation of qualified applicants" constituted "invidious discrimination under the Title II regulations.")

96) Defendants' inquiry into Plaintiff's history of disability has a more insidious discriminatory effect of deterring Plaintiff from seeking treatment.

97) This deterrence factor was part of the basis for the State of Minnesota Supreme Court's order <u>In re Petition of Frickey, et al.</u>, 515 N.W.2d 741 (Minn. 1994) where questions regarding mental health history from bar admissions application were deleted on grounds they deterred law students from seeking counseling.

98) The Virginia District Court reached the same conclusion: "...Broad mental health questions may inhibit the treatment of applicants who do seek counseling.  Faced with the knowledge that one's treating physician may be required to disclose

diagnosis and treatment information, applicant may be less than totally candid with their therapist." <u>Clark</u> at 438.

99) Defendants' actions are particularly egregious considering they removed Question #40 (regarding hospitalization for mental disabilities) from their application, following a four-year lawsuit with the ACLU who argued this question violated the ADA.

100)    Furthermore, the National Conference of Bar Examiners (NCBE) has also removed mental health history questions from its application, as have most other jurisdictions.

101)    Therefore, it is apparent that law examiners and courts throughout the country have come to realize that inquiries into mental disability history are discriminatory under the ADA and/or unnecessary.

102)    Defendants 18-month admission deadline (from date of passing bar) violates the ADA as the deadline discriminates against Plaintiff, an applicant who is engaged in a bona fide dispute regarding the discloser of confidential records pertaining to Plaintiff's disability.

103)    In September 21, 2005 Plaintiff informed Defendants that Plaintiff's 1999 hospitalization was associated with a disability protected under the ADA (letter attached hereto as Exhibit "F").

104)    On November 9, 2005, Plaintiff wrote a 7-page letter to Defendant the Board (attached hereto as Exhibit "J"), explaining why Plaintiff did not have to provide the 1999 hospital record.

105)    After Plaintiff's second letter, the Board replied by letter dated December 8, 2005 (attached hereto as Exhibit "D'), stating that Plaintiff's letter was received 10 days after the 18-month deadline and that Plaintiff's application was denied, ignoring the content and request for a medical examination, stating that the 1999 hospital record was "necessary" to make a decision.

106)    Section 35.130(b)(6) of the ADA provides in part: "a public entity shall make **reasonable modifications** in policies, practices, or procedures when the modification are necessary to avoid discrimination on the basis of a disability…"

107)    Defendants' rigid application of an 18-month deadline and failure to provide a medical evaluation for Plaintiff violates this ADA provision.

108)    In order to comply with the ADA, any 18-month deadline must be stayed when there is a bona fide dispute concerning the application process.

109)    If Defendants' deadline is not extended, it discriminates against disabled applicants who do not wish to disclose medical history requested by Defendants.

110)    The effect of the 18-month deadline is to deny admission to disabled applicants who refuse to provide medical history, regardless of whether or not Defendants' requests are lawful.

111)    Congress sought to abolish unnecessary classifications based on disability by enacting Title II of the ADA.

112)    Nowhere was this need greater than in protecting the rights of persons with *mental* disabilities.

113)    The ADA outlaws these classifications and seeks to abolish attendant stereotypes and prejudices.

114)     Questions #39 and #40, the Board's 2004 inquiry panel hearing, the

Defendants' 18-month admission deadline, Defendants Authorization and

Release, the Board's failure to provide Plaintiff a medical evaluation, and the

Defendants' ultimate denial of Plaintiff's admission to practice for failing to

provide what is now a seven-year old medical record, violate the ADA.

115)     The aforementioned acts reflect the administering of a licensing program

in a manner that subjects Plaintiff to discrimination by "establishing

requirements" that subject disabled individuals to discrimination and by imposing

"eligibility criteria" that tend to screen out a "individuals with disabilities," and

by failing to make, "reasonable modifications in policies, practices, or

procedures... necessary to avoid discrimination on the basis of a disability..."

116)     As a result of the foregoing, Plaintiff has suffered and continues to suffer

damages enumerated in the final section of this complaint.

## SECOND CAUSE OF ACTION
## INVASION OF PRIVACY

117)     The CRA (42 U.S.C Section 1983) states:

(E)very person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia,
subjects, or causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress...

118)     Under the 14th Amendment and other provisions of the United States

Constitution, Plaintiff is vested a right of privacy which protects the

confidentiality of personal matters and vests Plaintiff with a constitutionally

protected interest in avoiding the disclosure of such personal matters.

119)     "The Due Process Clause directly protects fundamental aspects of

personal privacy against intrusion by the State." Mangels v. Pena, 789 F.2d 836,

839 (10th Cir. 1986).

120)     The Due Process Clause shields individuals from unwarranted demands

for disclosure of personal information to the government. See Ramie v. City of

Hedwig Village. 765 F.2d 490, 492 (5th Cir. 1985) (privacy right includes the

right be free "from the government inquiring into matters in which it does not

have a legitimate and proper concern.")

121)     Defendants, under color of state law, ordinance, regulation, custom, or

usage, have denied Plaintiff's rights privileges, or immunities secured by the

Constitution in violation of 42 U.S.C. Section 1983.

122)     Specifically, Defendants have violated Plaintiff's right to privacy by

requiring Plaintiff to answer Questions #39 and #40, by requiring Plaintiff to

execute a broad Authorization and Release, by repeated requests for a 1999

hospital record, and by posing invasive questions at an inquiry panel hearing,

including inquiries into September 11th and Plaintiff's name change.

123)     In Supreme Court of New Hampshire v. Piper, 470 U.S. 274 (1985), the

United States Supreme Court established the precedent that "the opportunity to

practice law should be considered a 'fundamental right.'"

124)     Strict scrutiny is applied to a State's interference with a fundamental right

such as the right to practice law and constitutional invasions of privacy.

125)     Defendants have the burden of proving that that their denial of Plaintiff's fundamental right to practice law and Defendants' invasion of privacy are "narrowly tailored" to meet a "compelling" state interest and that there are not "less intrusive means" of meeting their compelling interest.

126)     While the admission of qualified attorneys is a "compelling" interest, Defendants invasion of privacy is not "narrowly tailored" to meet this objective, and is therefore, unconstitutional.

127)     Furthermore, the Supreme Court held that, "…any qualification must have a rational connection with the applicant's fitness or capacity to practice law," when considering the case of an applicant who was wrongfully denied admission to the state bar, Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232 at 238 – 239 (1957).

128)     The right to privacy involves two distinct interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Whalen v. Roe, 429 U.S. 589, 600 (1977); Sheets v. Salt Lake County, 45 F.3d 1383, 1387 (10th Cir. 1995).

129)     The first of these is referred to as the interest in "confidentiality" and the second the interest in "autonomy." Hawaii Psychiatric Society v. Ariyoshi, 481 F. Supp. 1028, 1037-38 (D. Hawaii 1979).

130)     Question #39, which states in part: "Within the past five years have you been diagnosed with or been treated for any of the following: schizophrenia or any other psychotic disorder, delusional disorder, bipolar or manic depressive

mood disorder…" constitutes an invasion of privacy because it unnecessary to delve into Plaintiff's 5-year medical *history* to determine Plaintiff's ***present ability*** to practice law.

131)    This is especially true considering that Defendants are composed of attorneys lacking the medical expertise necessary to interpret the implication of medical history.

132)    Question #40 asks: "Within the past five years, have you at any time been admitted as a patient to a hospital, either on a voluntary or involuntary basis, for treatment of any emotional or mental disability or disorder?"

133)    Question #40 and follow-up inquiries are not narrowly tailored because they make no allowances for grief therapy.

134)    The NCBE and even the Defendants' current application do so.

135)    Defendants required Plaintiff to execute an Authorization and Release (attached hereto as Exhibit "C"), which also constitutes an invasion of privacy:

> I hereby authorize and request every person, firm, company, corporation, governmental agency, court, association or institution having control of any documents, records and other information, including documents, records, bar association files regarding charges or complaints filed against me, including all complaints erased by law, formal or informal, pending or closed, or any other pertinent data, to permit the Colorado Board of Law Examiners or any of its agents or representatives to inspect and make copies of such documents, records and other information.

136)    The aforementioned Authorization and Release violates Plaintiff's constitutional right of privacy because it is vague and overly intrusive, allowing Defendants to go on a fishing expedition into 19 years of Plaintiff's history (ages 18 – 37), including medical records pertaining to Plaintiff's disability and other personal private matters that have no bearing on Plaintiff's ability to practice law.

137)      The Board's 2004 and 2005 demands for Plaintiff's 1999 hospital record and the ultimate denial of Plaintiff's application for failure to provide this record are an invasion of privacy because Defendants do not have compelling reasons to obtain Plaintiff's medical history and these request are not "narrowly tailored" to achieve that goal.

138)      The Board has a compelling interest in determining Plaintiff's *present* fitness to practice law.

139)      Plaintiff's medical condition in 1999 is irrelevant to this inquiry and the Board's persistent demands therefore constitute an invasion of privacy.

140)      Plaintiff's history of treatment for bipolar disorder is of a highly personal nature, no less than a cancer patient who has had chemotherapy and radiation.

141)      "The right to confidentiality includes the right to protection regarding information about the state of one's health," and "(T)here are few matters that are quite so personal as the status of one's health, and few matters the dissemination of which one would prefer to maintain greater control over." Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1990).

142)      "There can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." United States v. Westinghouse Elec. Corp., 638 F.2d 570, 577 (3d. Cir. 1980).

143)      Questions #39 and #40 as well as the Board's requests for Plaintiff's 1999 hospital record constitute invasions of privacy as communications between psychiatrist and patients involve, "precisely the areas recognized... as within the

protected zone of privacy, including family, marriage, parenthood, human sexuality, and physical problems." <u>Hawaii Psych. Soc'y.,</u> 481 F. Supp. At 1038.

144)      Plaintiff's right to practice law in the State of Colorado was withheld because Plaintiff failed to relinquish his right to privacy.

145)      Namely, by failing to produce what is now a 7-year old hospital record pertaining to Plaintiff's mental disability (*see*, the Board's letter of December 2005 denying Plaintiff's admission to practice attached hereto as Exhibit "D").

146)      "No area could be more deserving of protection" than psychiatrist-patient communications. <u>Hawaii Psych. Soc'y.</u>, 481 F. Supp at 1038.

147)      In <u>Clark v. Virginia Board of Bar Examiners</u>, 880 F.Supp. at 431 (E.D.Va. 1995) the court stated that according to the American Psychiatric Association (APA), "psychiatric history should not be the subject of applicant inquiry because it is not an accurate predictor of fitness."

148)      The APA guidelines also state that, "The salient concern is always the individual's current capacity to function... Only information about disorder that currently impair the capacity to function... should be disclosed on an application."

149)      The aforementioned conclusions of the APA would make Questions #39 and #40 and the Board's 2004 and 2005 requests for a 1999 hospital record unnecessary, and therefore, an invasion of privacy as the questions are not "narrowly tailored."

150)      The Board's September 11th inquiries constitute an invasion of privacy as they were not narrowly tailored to meet Defendants' interests.

151)    While many of the questions asked by the Board at the inquiry panel hearing did have a "rational connection" to Plaintiff's "fitness or capacity to practice law," many lines of inquiry were not "narrowly tailored" to meet this objective, infringing upon Plaintiff's interests in "confidentiality" and "autonomy," constituting an invasion of privacy.

152)    Plaintiff lived and worked in "Zone 1" on the morning of September 11th, a few blocks from the World Trade Center.

153)    After Plaintiff relayed experiences associated with September 11th at an inquiry panel hearing, the leader of the inquiry asked if Plaintiff had sought psychotherapy, and then suggested multiple times that Plaintiff do so.

154)    Inquiring into the details of a traumatic experience before a Board of lawyers constitutes invasion of privacy.

155)    Furthermore, it is clear from the Board's application process that answering "YES" to such a question will provoke a deeper inquiry including demands for medical records; the Board's approach therefore has the secondary effect of discouraging Plaintiff from seeking or disclosing therapy for fear that these records will have to be disclosed to Defendants.

156)    The Board's name change inquiries posed at the 2004 inquiry panel hearing constitute an invasion of privacy as well.

157)    In 2002, Plaintiff legally changed his name from Evan Spencer Feinberg to Evan Spencer (court order attached hereto as Exhibit "K").

158)    Plaintiff forwarded a copy of this court order to the Board.

159)     At the inquiry panel hearing the Board asked Plaintiff why he changed his name.

160)     Plaintiff informed the Board that he did so to avoid religious persecution.

161)     Additional inquiry into this matter beyond Plaintiff's response constitutes an invasion of privacy as Plaintiff's name change does not have a "rational connection" to Plaintiff's "fitness or capacity to practice law."

162)     In Schware v. Board of Bar Examiners of New Mexico, 353 U.S. 232 (1957) an applicant was accused of having bad moral character for using an alias. The Court stated that, "(O)f course it is wrong to use an alias when it is done to cheat or defraud but it can hardly be said that Schware's attempt to forestall anti-semitism in securing employment or organizing his fellow workers was wrong."

163)     Changing one's name is a common occurrence that is private in nature.

164)     Women change their name when they marry or divorce, multiple times in some cases.

165)     People of many ethnicities change their names to limit racial prejudices.

166)     It is common for people of Jewish descent to change their names to avoid religious prejudices or stigmatization.

167)     The Board required Plaintiff to give examples of racial prejudice that Plaintiff has encountered.

168)     Plaintiff responded with a Colorado example, when a lawyer at a meeting in Colorado explained how he had "Jewd someone down." Faces were made by the Board if this wasn't a powerful example.

169)     There were other more private matters that Plaintiff did not wish to share with the Board.

170)     Plaintiff's religious affiliation is a private matter that Plaintiff no longer wishes to announce by the pronouncement of a name.

171)     Spencer is a benign name without any religious or ethnic connotation.

172)     The Board also asked how Plaintiff's family felt about the name change.

173)     This line of inquiry crosses into personal matters that do not have a "rational connection" to Plaintiff's "fitness or capacity to practice law."

174)     The "feelings" of Plaintiff's family are irrelevant to Plaintiff's fitness to practice law and inquiry into these matters constitutes an invasion of privacy.

175)     The implication of the Board's question is that there is something wrong with Plaintiff's name change.

176)     The Board's excessive inquiry with regard to Plaintiff's name change constitutes an invasion of privacy as this excessive inquiry implies that they did not believe Plaintiff's explanation (ie. avoiding religious prejudice), for if they did, why would it be necessary to ask additional questions?

177)     As a result of the foregoing, Plaintiff has suffered and continues to suffer damages enumerated in the final section of this complaint.


### THIRD CAUSE OF ACTION
### EQUAL PROTECTION VIOLATIONS

178)     The Equal Protection Clause of the 14th Amendment states that, "No state shall make or enforce any law which shall… (deny) any person within its jurisdiction the equal protection of the laws."

28

179)     The Equal Protection Clause requires State's laws and the application of those laws to treat Plaintiff in the same manner as others in similar conditions and circumstances, in an equal, fair, and just manner.

180)     By denying Defendants the ability to discriminate, the Equal Protection Clause is crucial to the protection of Plaintiff's civil rights.

181)     Generally, the question of whether the Equal Protection Clause has been violated arises when a State grants a particular class of individuals the right to engage in activity yet denies other individuals the same right.

182)     Defendants' treatment of Plaintiff is not only unfair on its face, when compared to Defendants' treatment of Colorado attorneys and bar applicants, it clearly constitutes a denial of Equal Protection.

183)     From 2001 through August 2006, Defendant the Court issued Conditional Admissions of Misconduct and other disciplinary actions against nearly 300 Colorado attorneys.

184)     While Plaintiff, a practicing lawyer from New York without a single complaint in nearly 10 years of practice was denied admission for failing to produce what is not a 7-year old medical record, Defendant the Court routinely allows convicted criminals to practice law in the State of Colorado.

185)     In a Conditional Admission of Conduct dated 9/18/03, one Colorado attorney who was convicted of a felony for exposing himself to an 8-year old, was sent to jail for 2 1/2 years, thereafter resuming the practice of law in Colorado.

186)     If attorneys who steal from their clients or expose themselves to children have the moral character to practice law in the State of Colorado, it is clearly a

denial of Equal Protection to deny Plaintiff the right to practice for failing to produce what is now a 7-year old hospital record.

187)     Plaintiff's only "misconduct" was attempting to conceal his disability, which is neither immoral nor illegal in the face of an illegal and unconstitutional inquiry posed by Defendants.

188)     Defendants conduct toward Plaintiff is based upon bigotry and prejudices that have no basis in fact or law, constituting a denial of Equal Protection.

189)     Defendants conduct fails to meet even a rational basis standard as there is no rational basis to conclude that Plaintiff is less capable of practicing law than the hundreds of Colorado attorneys who have been issued Conditional Admissions of Misconduct.

190)     As a result of the foregoing, Plaintiff has suffered and continues to suffer damages enumerated in the final section of this complaint.

## FOURTH CAUSE OF ACTION
## CONSTITUTIONAL DUE PROCESS VIOLATIONS

191)     The 14th Amendment Due Process Clause states that no citizen shall be "deprived of life, liberty or property without due process of law."

192)     The right to practice law in the State of Colorado is both a "property" right and a "liberty" right within the meaning of the 14th Amendment.

193)     Due Process includes both "substantive" Due Process and "procedural" Due Process rights, both of which have been violated by Defendants.

194)     Substantive Due Process includes the privacy protections enumerated in the Second Cause of Action, as well as protections of Plaintiff's liberty.

195)     The Supreme Court has recognized there is substantial liberty interest under the Due Process Clause of the Constitution in avoiding the social stigma of being known to have been treated for a mental illness.

196)     "An individual's liberty is 'substantially affected' by the stigma attached to treatment in a mental hospital Parham v. J.R., 442 U.S. 584, 622;

197)     "Discharged patients must not only cope with the stigma of having once been hospitalized, but must often continue to cope with the 'mental illness' label itself... Even the most enlightened persons may unwittingly harbor views associated with this stigma." In Re John B., 482 F.2d 648, 668 (D.C. Cir. 1973).

198)     "Congress, in enacting the 'regarded as' provision, acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from the impairment." County v. Arline, 480 U.S. 273 (1987).

199)     Questions #39 and #40, Defendants' Authorization and Release, and requests for Plaintiff's 1999 hospital record violate this "liberty" principle by forcing Plaintiff to relinquish personal information regarding mental illness as a condition of practicing law.

200)     Defendants have violated Plaintiff's liberty by stigmatizing Plaintiff based upon mental illness, a denial of substantive Due Process.

201) Procedural Due Process pertains to fairness in the application process, including Plaintiff's rights regarding "notice," and an "opportunity to be heard," as well as the application of general principles of neutrality and objectivity.

202) Defendants denied Plaintiff procedural Due Process throughout the application process and by their ultimate denial of Plaintiff's application in a number of ways.

203) The Board's denial letter (attached hereto as Exhibit "D") states that "applicants must demonstrate that they are mentally stable and ethically and morally qualified," yet Defendants denied Plaintiff the opportunity of doing.

204) As Plaintiff offered to appear for a medical evaluation to provide proof of mental stability (see Plaintiff's November 21, 2005 letter attached hereto as Exhibit ("J"), the Board's denial of this opportunity constitutes a denial of procedural Due Process.

205) Despite the fact that the ACLU sued Defendants from 1998 – 2002 with regard to many of the same issues presented in this lawsuit, Defendants failed to inform applicants, including Plaintiff, directly, or with a notice on their web site or other correspondence.

206) Hiding this discrimination and invasion of privacy lawsuit by Colorado bar applicants is unfair to other applicants such as Plaintiff who would have joined this lawsuit, constituting a denial of procedural Due Process.

207) The Board's application of an 18-month admission deadline violates procedural Due Process in Plaintiff's case because there is a bona fide dispute concerning the application process.

208)   If Defendants fail to extend this deadline, disabled individuals such as Plaintiff who do not wish to disclose personal matters requested by the Board are unfairly denied admission to practice.

209)   Such a rule acts as a complete bar of admission to anyone, including Plaintiff, who fails to comply with the Board's requests, even requests that are illegal, discriminatory, and unconstitutional.

210)   The Board was also negligent over the past year in failing to contact the Department of Justice to consider whether their request was appropriate, a procedural Due Process violation.

211)   As the Board is well aware, the United States Constitution and Acts of Congress are the supreme laws of this country.

212)   Colorado law does not empower the Board to violate the Constitution or the ADA.

213)   If there is a conflict between State and Federal law or the Constitution, Federal law and the Constitution prevail.

214)   If a demand for a now a 7-year old hospital record violates the ADA and privacy rights under the Constitution, the Board must withdraw this request.

215)   The Board spent over one year trying to bully Plaintiff into providing this 1999 record, and have not provided any legal or medical reasons why this is "necessary," a violation of procedural Due Process.

216)   The attorney leading the inquiry panel hearing suggested in front of the entire Board that Plaintiff undergo psychotherapy as a result of witnessing the events of September 11th, an insulting, embarrassing, and stigmatizing comment

that suggests to the Board that witnessing the events of September 11th makes

Plaintiff unfit to practice, a denial of procedural Due Process.

217)      Suggesting that Plaintiff seek therapy for September 11th violates

procedural due process because it suggests to the remainder of the Board that

Plaintiff is psychologically unstable.

218)      This act is particularly egregious considering that the leader of the inquiry

has no medical training.

219)      At the end of Defendants' inquiry panel hearing, the leader asked Plaintiff,

"what do you plan to do if you can't practice law in Colorado?"

220)      This aforementioned comment denies Due Process by prejudicing the

application process.

221)      Firstly, the aforementioned question implies that the Board or at least the

leader of the inquiry has already decided not to admit me, for if I was to be

admitted, what purpose would this question serve?

222)      Rushing to judgment before the Board has completed the application

process is a denial of procedural Due Process.

223)      Secondly, the aforementioned question is a personal matter that does not

have a "rational connection" to Plaintiff's "fitness or capacity to practice law."

224)      Why is it necessary for the Board to know what Plaintiff is going to do if

Plaintiff were denied admission to practice law in Colorado?

225)      Thirdly, the aforementioned question is also a denial of Due Process

because it is discouraging to the applicant.

226)      Due Process includes notions of "fair play" and "substantial justice."

34

227)    When the leader of an inquiry asks 'what (Plaintiff) plans to do if (Plaintiff) can't practice law in Colorado,' with a condescending tone and expression, it demonstrates a lack of objectivity and neutrality, affects the other Board members, and discourages the applicant from completing the application process, a denial of procedural Due Process.

228)    The Defendants have a duty to maintain a stance of objectivity and neutrality until a final decision has been reached.  The failure to do so constitutes a denial of procedural Due Process.

229)    Defendants' invasive inquiries in the application process, including the application itself, the inquiry panel hearing, and other correspondence, violate procedural Due Process by placing Plaintiff in a lose-lose scenario.

230)    Plaintiff was faced with the choice of answering questions that invaded Plaintiff's privacy and subjected Plaintiff to discrimination in violation of the ADA and Constitution, subjecting Plaintiff to stigmatization and prejudicial treatment, or trying to conceal Plaintiff's disability and protect Plaintiff's privacy with a lack of candor.

231)    Defendants' application process also violates the ADA by requiring Plaintiff to execute a broad "Authorization and Release" form (attached hereto as Exhibit "C").

232)    The aforementioned Authorization and Release violates Plaintiff's privacy and liberty rights under the Due Process clause by requiring Plaintiff to expose all aspects of 19 years of past history (ages 18 -- 37) to Defendants as a prerequisite for becoming an attorney in the State of Colorado.

233)     Such an overly broad inquiry is not necessary to accomplish Defendants' legitimate interest in admitting qualified applicants for the practice of law.

234)     The aforementioned Authorization and Release also violates procedural Due Process by unfairly posing unnecessary burdens in the application process.

235)     Lastly, Plaintiff's Due Process rights have been violated because the scores of ADA and Constitutional violations committed by Defendants have tainted the application process, eliminating the possibility for Plaintiff to be evaluated fairly, a denial of both substantive and procedural Due Process.

236)     During the 3-year application process, Defendants' inquiry panel hearing, letters, and other inquiries and characterizations, Plaintiff has been falsely characterized as being mentally unstable.

237)     The Defendants' 2002 application and subsequent inquiries and correspondence, continuing to denial of admission in 2005, have made it impossible for Plaintiff to be fairly evaluated for admission to the Colorado bar.

238)     As a result of the foregoing constitutional Due Process violations, Plaintiff has suffered and continues to suffer damages enumerated in the final section of this complaint.


## FIFTH CAUSE OF ACTION
## INTERSTATE PRIVILEGES AND IMMUNITIES VIOLATIONS


239)     Article IV of the Constitution states that "the Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

240)     In <u>Supreme Court of New Hampshire v. Piper,</u> 470 U.S. 274 (1985), the

United States Supreme Court established the precedent that a, "nonresident's

interest in practicing law is a 'privilege' protected by the Clause."

241)     In <u>Piper</u>, a Vermont attorney was denied admission to the New Hampshire

Bar for failing to meet a residency requirement.

242)     The Supreme Court ruled that, "the opportunity to practice law should be

considered a 'fundamental right...' and that a state may only discriminate against

nonresidents only where its reasons are 'substantial,' and the difference in

treatment bears a close or substantial relation to those reasons." <u>Piper</u> at 277.

243)     Colorado has no residency requirement, but several aspects of their

application process do constitute discrimination against out-of-state attorneys.

244)     Plaintiff was denied the right to practice law, at least in part, due to his

status as an out-of-state applicant (a New York attorney applying for admission to

the Colorado bar).

245)     Defendants have no defense as out-of-staters, specifically New York State

bar applicants such as Plaintiff, are not a "peculiar source of evil" and Defendants

are not acting as a "market participant."

246)     Defendants have clearly treated Plaintiff, an out of state applicant,

different than Colorado applicants and attorneys.

247)     The Board's admission process also violates the Privileges and Immunities

Clause because of the disparate way they have treated Plaintiff as compared to

Colorado attorneys.

248)    The Board's conduct suggests that the New York Board of Law Examiners accepts unqualified applicants and/or that the State of New York allows unqualified applicants to practice law.

249)    To comply with the Privileges and Immunities Clause, a State may not scrutinize an out-of-state lawyer seeking admission greater than they scrutinize attorneys in their own state.

250)    Plaintiff fulfilled all requirements for admission to the Colorado bar.

251)    During nearly 10 years of admission in New York, there has never been a single phone call, letter, or any complaint made to the State of New York of any kind with regard to Plaintiff's practice of law.

252)    There are no circumstances when the State of Colorado investigates old medical records of Colorado attorneys who have practiced without incident.

253)    Defendants are holding Plaintiff to a higher standard than in-state attorneys, which violates the Privileges and Immunities Clause.

254)    The State of Colorado routinely issues Conditional Admissions of Misconduct and brief suspensions of 30, 60, or 366 days to lawyers who steal from their clients, commit crimes, and significant ethical improprieties, including malpractice, converting client funds for personal use, duplicative billing, and failure to pay child support.

255)    In case# 03PDJ015, a Colorado attorney pled guilty to attempted sexual assault on an 8 year old, a felony, was sentenced to two and one-half years in prison, and was suspended (not disbarred) for three years.

256)     Nearly 300 cases of Misconduct and Suspensions are posted on the
Colorado Supreme Court web site as "Public Record."

257)     Plaintiff is being punished more harshly than Colorado lawyers who steal
from their clients and a felon who attempted to sexually assault a child.

258)     Defendants have denied Plaintiff admission for failing to provide a
confidential medical record that has no bearing on Plaintiff's present ability to
practice law, yet Colorado lawyers who commit crimes are slapped on the wrist
and their licenses are returned.

259)     Defendants are clearly treating Plaintiff, an out-of-state lawyer, much
more harshly than it treats Colorado lawyers, in violation of the Privileges and
Immunities Clause.

260)     Following a lawsuit with the ACLU from 1998 – 2002, Defendants
modified bar application questions and began giving bi-annual presentations at
Colorado law schools to inform Colorado applicants about the bar application
process and the questions that remained on the bar application.

261)     However, no equivalent accommodation was made for out-of-state
applicants/attorneys: not a letter, e-mail or blurb on the web site was provided.

262)     Despite four years of litigation and modification of their application,
Defendants essentially tried to disguise this matter from out-of-state attorneys.

263)     Plaintiff executed a copy of the old application in 2002, and was never
informed of the modifications, which included exclusions for "situational
counseling such as grief counseling or relationship counseling."

264)     Treating Colorado applicants more favorably than out-of-state applicants constitutes a violation of the Privileges and Immunities Clause.

265)     The Board has applied much higher standards of inquiry and scrutiny to Plaintiff as out-of-state attorney, has punished Plaintiff much more harshly than Colorado attorneys who have committed misdemeanors and felonies, and has provided Plaintiff with no accommodations for their discriminatory application while doing so for Colorado applicants.

266)     Viewed jointly, this conduct discriminates against Plaintiff based upon Plaintiff's status as an out-of-state attorney, in violation of the Privileges and Immunities Clause.

267)     As a result of the foregoing, Plaintiff has suffered and continues to suffer damages, enumerated in the final section of this complaint.

## DAMAGES AND REQUESTS FOR RELIEF

268)     Plaintiff's treatment of his disability has been detrimentally affected as a direct result of Defendant's discriminatory, unconstitutional, and illegal practices.

269)     Defendant's overzealous inquiry into Plaintiff's medical history during a three (3) year application process caused Plaintiff to limit treatment and to censor discussions and disclosures to doctors.

270)     After Plaintiff was denied admission, Plaintiff resumed regular treatment and full disclosure, experiencing a dramatic improvement in treatment and the condition of Plaintiff's disability.

271)     Plaintiff has unjustly been denied the right to practice law for 2 ½ years, despite fulfilling all requirements for admission.

272)     While Plaintiff moved to Colorado to practice law, Defendants have wrongfully denied Plaintiff the right to do so.

273)     Plaintiff has been deprived of the ability to earn a livelihood, has been stigmatized by the inquiry, and has lost status as a professional in the community.

274)     Plaintiff's identity and reputation have been tarnished.

275)     Plaintiff has sustained significant lost-earnings and has suffered severe mental and emotional distress as a result of the Board's discriminatory practices.

276)     As a result of the foregoing, Plaintiff demands twenty-five million dollars $25,000,000.00 in compensatory damages to compensate Plaintiff for the loss of Plaintiff's career, including past and future lost earnings, as well as damage to Plaintiff's personal and professional reputation, together with emotional and psychological damages suffered at the hands of the Defendants.

277)     Due to the intentional, discriminatory, and unconstitutional nature of Defendants' numerous constitutional violations and illegal conduct, Plaintiff demands punitive/exemplary damages in the amount of seventy-five million dollars $75,000,000.00 to punish the Defendants and deter similar conduct in the future.

278)     Plaintiff requests a jury trial.

WHEREFORE, Plaintiff respectfully requests that the aforementioned relief be granted in its entirety, together with the costs and disbursements of this action, along with such other and further relief as this court deems just and proper.

Evan Spencer
Pro Se Plaintiff
721 East 34th Place
Loveland, CO 80538
Tel. 970.391.9709
Email. EvanEsquire@aol.com

DEFENDANT
Colorado Supreme Court Board of Law Examiners
1560 Broadway Street, Suite 1820, Denver, CO 80202 - Tel. 303.866.6626

DEFENDANTS
Alan K. Ogden, Susan Q. Gleeson, Susan B. Hargleroad, Shari Frausto, Les Woodward, Carlos Samour, James Coyle, III, Linda Donnelly, and Melanie Backes, c/o Colorado Supreme Court Board of Law Examiners
1560 Broadway Street, Suite 1820, Denver, CO 80202 - Tel. 303.866.6626

DEFENDANT
Colorado Supreme Court
2 E. 14th Avenue, Denver, CO 80203 - Tel. 303.861.1111

DEFENDANTS
Justice Mary J. Mullarkey, Justice Michael L. Bender, Justice Gregory J. Hobbs, Jr., Justice Nancy E. Rice, Justice Alex J. Martinez, Justice Nathan B. Coats, and Justice Allison Eid, c/o Colorado Supreme Court, 2 E. 14th Avenue, Denver, CO 80203 - Tel. 303.861.1111

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
901 19th St., Denver, CO 80294
Tel. 303.844.3433